IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EMMANUEL TYREE
HOLLIDAY,

                          Plaintiff,

            v.                                    Civil Action No. 21-1310-CFC

CHRISTINE CLAUDIO and
CHRISTINE ONOFRIO,

                          Defendants.

---

Emmanuel Tyree Holliday,

            *Pro Se*

Dawn C. Doherty and Brett T. Norton, MARKS, O'NEILL, O'BRIEN,
DOHERTY & KELLY, P.C., Wilmington, Delaware

            *Counsel for Defendants*

## **MEMORANDUM OPINION**

August 21, 2025
Wilmington, Delaware



COLM F. CONNOLLY
CHIEF JUDGE

Plaintiff Emmanuel Tyree Holliday, a former inmate at Howard R. Young

Correctional Institution (HRYCI), filed this lawsuit in September 2021 pursuant to

42 U.S.C. § 1983, alleging violations of his constitutional rights. D.I. 3. He

appears *pro se* and was granted permission to proceed *in forma pauperis* pursuant

to 28 U.S.C. § 1915. D.I. 5. Pending before me is a motion for summary

judgment filed by Defendants Christine Claudio and Christine Onofrio.[1] D.I. 59.

Plaintiff's motion to appoint counsel is also pending before me. D.I. 77.

## I.    BACKGROUND

Plaintiff alleges that, during his incarceration at HRYCI, he suffered

compensable harm caused by denial of and extreme delay in providing medical

treatment for his left shoulder. D.I. 3. He appears to seek both damages and

injunctive relief.[2] D.I. 3 at 7. Upon screening, I liberally construed the allegations

and allowed Plaintiff to proceed on a § 1983 claim against Defendants. D.I. 18.

---

[1] The Complaint names "Christin the Consult Coordinator" and "Christin Clauidio" as defendants. D.I. 3 at 2–3. "Christin the Consult Coordinator" refers to Christine Onofrio. *See* D.I. 59-4. "Christin Clauidio" refers to Christine Claudio. *See* D.I. 59-3.

[2] In the section entitled "Relief" in his Complaint, Plaintiff states, "The relief I want the court to order is: To fix this problem." D.I. 3 at 7. I interpret this language as a request for injunctive relief. The Complaint also states that Plaintiff

At all times relevant to Plaintiff's allegations, Defendants worked in administrative roles for companies, including at times Centurion of Delaware, LLC (Centurion), contracted by HRYCI to provide medical services to prisoners.[3] *See* D.I. 59-3 ¶¶ 2–5; D.I. 59-4 ¶¶ 2–5. Claudio served as a Health Services Administrator (HSA). D.I. 59-3 ¶ 2. The HSA role is "solely administrative," so Claudio "[did] not provide any clinical care or otherwise treat the incarcerated persons." D.I. 59-3 ¶ 4. Instead, Claudio was responsible for "oversee[ing] the administrative medical operations," including the Consult Coordinator. D.I. 59-3 ¶ 3.

Onofrio was a Consult Coordinator. D.I. 59-4 ¶ 2. The Consult Coordinator role is "mostly administrative," but Onofrio also "provide[d] very limited clinical care, such as heart monitoring for incarcerated persons who have implantable cardioverter-defibrillators and setting up sleep studies." D.I. 59-4 ¶ 4. As relevant here, some of Onofrio's duties as the Consult Coordinator were locating "outside, specialist medical providers" for inmates based on "approved consultation

---

seeks money damages in an amount "[t]o be determ[ined] by[] the courts." D.I. 3 at 7.

[3] On July 1, 2023, the State of Delaware contracted with a different company to provide prison health care services. D.I. 59-3 ¶ 5; D.I. 59-4 ¶ 5. Despite the change in company, Defendants still work in their same roles at the prison. D.I. 59-3 ¶¶ 2, 5; D.I. 59-4 ¶¶ 2, 5.

requests"; scheduling appointments for inmates with medical providers who would accept the inmate as a patient; and "coordinating transportation for the inmate" between the medical provider's office and the prison. D.I. 59-4 ¶ 11.

A series of steps must be completed for an inmate to see an outside medical specialist. *See* D.I. 59-4 ¶¶ 12–15. First, a prison medical provider must submit a consultation request. *See* D.I. 59-4 ¶ 12. That request can involve, among other things, ordering a diagnostic test, such as an MRI, or referring an inmate to a medical specialist. *See, e.g.*, D.I. 62 at 58, 60. Second, the consultation request must be approved by the Medical Director and authorized by Utilization Management. *See* D.I. 59-4 ¶ 13. Third, the Consult Coordinator must locate an outside medical practitioner who will accept the inmate as a patient. *See* D.I. 59-4 ¶ 11. Fourth, once an outside provider has been located, the Consult Coordinator schedules an appointment with the provider based on the level of urgency for the appointment as determined by the prison medical provider who made the consultation request. *See* D.I. 59-4 ¶ 12.

Plaintiff alleges that he began to experience left shoulder pain before he was incarcerated on August 24, 2020. D.I. 3 at 4 (explaining how his shoulder pain existed in 2019 before his detainment). Plaintiff says that he began requesting medical care for his shoulder at the time of his intake. D.I. 3 at 4. His medical records, however, show that he first asked to see a provider about his left shoulder

3

pain on October 5, 2020. D.I. 62 at 55. His records further show that a provider

saw Plaintiff the next day and that Plaintiff presented the provider with

"complaints of chronic left shoulder pain though he denies any new or recent

injury." D.I. 62 at 54. One week later, Plaintiff received an x-ray of his left

shoulder. D.I. 62 at 52. The results of that x-ray were normal. D.I. 62 at 52.

Over the next four months, Plaintiff made several visits to the prison medical

provider for alleged persistent left shoulder pain. D.I. 62 at 47–49, 50–52. During

those visits, Plaintiff reported a moderate to high level of pain, but his shoulder had

a full range of motion and showed no signs of damage. D.I. 62 at 47–49, 50–52.

Despite being prescribed pain medication and physical therapy, Plaintiff asked

repeatedly for an MRI. D.I. 3 at 4–5; D.I. 62 at 51–52 (Plaintiff requesting an MRI

in his provider visits on October 26, 2020, November 5, 2020, November 18, 2020,

and November 20, 2020).

Defendants first became involved with the scheduling of Plaintiff's medical

treatments in February 2021, when a prison medical provider, Shatyra Hamwright,

requested that Plaintiff receive an MRI. D.I. 62 at 47, 58. Hamwright did not

mark the request as "emergent." D.I. 62 at 58; D.I. 59-3 ¶ 12; D.I. 59-4 ¶ 12.

After the request was approved by the Medical Director and authorized by

Utilization Management, Onofrio scheduled the MRI. D.I. 59-4 ¶¶ 12–15.

Claudio oversaw Onofrio during this process. D.I. 59-3 ¶ 12. On March 23, 2021,

4

a little over one month after the consult request, Plaintiff received his MRI. D.I. 62 at 17, 42, 59. The MRI scan showed a nonunited fracture of the posterior glenoid and a labral tear. D.I. 62 at 42, 59. A nonunited fracture suggests that Plaintiff's injury is "old" and occurred before his incarceration. D.I. 59-3 ¶ 16 (explaining how "a nonunion of a bone occurs when a fracture persists for a minimum of nine months without signs of healing for three months"); D.I. 59-4 ¶ 16.

The next day, a prison medical provider reviewed the MRI results with Plaintiff and submitted a request for Plaintiff to see an orthopedic surgeon. D.I. 62 at 42. Onofrio scheduled an appointment for Plaintiff at Bayhealth Orthopedics. D.I. 59-4 ¶ 17. On April 23, 2021, Plaintiff saw an orthopedic surgeon, who determined that Plaintiff needed to see an orthopedic trauma specialist. D.I. 62 at 39; D.I. 3 at 5; D.I. 62 at 60 (requesting that Plaintiff be scheduled with an orthopedic trauma specialist). Onofrio began to search for orthopedic trauma surgeons. D.I. 59-4 ¶ 18.

Defendants struggled to find an orthopedic trauma surgeon who would accept Plaintiff as a patient. *See* D.I. 59-4 ¶ 19; D.I. 59-3 ¶ 18. Defendants contacted in-state practitioners as well as out-of-state practitioners. D.I. 59-4 ¶¶ 19, 22; D.I. 59-3 ¶¶ 20, 23. Defendants also worked with "[u]tilization management and [a] Centurion Insurance contact" to find a "[t]rauma [s]urgeon that would take Centurion insurance." D.I. 62 at 17; *see* D.I. 59-4 ¶ 27; D.I. 59-3

¶ 28. On September 14, 2021, Onofrio contacted Bayhealth Orthopedics for a recommendation for an orthopedic trauma surgeon. D.I. 62 at 15.

In the meantime, Plaintiff continued to meet with prison medical providers and hospital administrators. D.I. 3 at 6; D.I. 62 at 14–23. At these visits, the providers informed Plaintiff that the prison was still attempting to find an orthopedic trauma surgeon who would see him. D.I. 3 at 6; D.I. 62 at 14–23. As of September 15, 2021, the day that Plaintiff filed his Complaint, Plaintiff had not seen an orthopedic trauma surgeon.

On October 26, 2021, Defendants found an out-of-state orthopedic trauma surgeon who would accept Plaintiff as a patient and scheduled a consult with that surgeon, Dr. James Krieg. D.I. 62 at 12; D.I. 59-4 ¶ 29; D.I. 59-3 ¶ 30. Less than one month later, on November 16, 2021, Dr. Krieg saw Plaintiff in Philadelphia. D.I. 62 at 9. Dr. Krieg informed Plaintiff that there was nothing he could do to help, and he recommended that Plaintiff see a shoulder specialist. D.I. 62 at 61. On December 6, 2021, a prison medical provider requested that Plaintiff be referred to a shoulder specialist. D.I. 62 at 65. On December 17, 2021, after approval of this request by the Medical Director and Utilization Management, Onofrio began searching for a shoulder specialist. D.I. 59-4 ¶ 31. Defendants could not locate a shoulder specialist before Plaintiff's release from prison on January 26, 2022. D.I. 62 at 5; D.I. 59-4 ¶ 31; D.I. 59-3 ¶ 32.

6

Neither Defendant has had any involvement with Plaintiff or his medical care since his release from HRYCI in January 2022. D.I. 59-3 ¶ 33; D.I. 59-4 ¶ 32. In a sworn declaration submitted in support of Defendants' summary judgment motion, Onofrio states that she "never acted intentionally to hinder, delay, or stop the search for an orthopaedic surgeon who would accept Plaintiff as a patient," that she "tirelessly tried to locate an accepting physician," and that she used her "best efforts" "to find an accepting surgeon as soon as practicable given the complexities afforded under the prison environment coupled with the COVID-19 pandemic." D.I. 59-4 ¶ 33. Claudio, too, in a sworn declaration states that she "never acted intentionally to hinder, delay, or stop the search for an orthopaedic surgeon who would accept Plaintiff as a patient," that she "supported efforts in trying to locate an accepting physician," and that she "oversaw [Onofrio] and believe[s] that best efforts were engaged to find an accepting surgeon as soon as practicable given the complexities afforded under the prison environment coupled with the COVID-19 pandemic." D.I. 59-3 ¶ 34.

Plaintiff does not dispute in his response (D.I. 63) or sur-reply (D.I. 67) to Defendants' summary judgment motion that Defendants were not his medical providers, had no obligation to provide him medical care, and did not provide him with medical care. *See generally* D.I. 63; D.I. 67. Nor does Plaintiff dispute Defendants' assertions that they gave their best efforts to obtain for him timely

7

medical care and that they never acted with an intent to delay the provision of

medical care to him. *See generally* D.I. 63; D.I. 67.

## II.   LEGAL STANDARDS

A court must grant summary judgment "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of

demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v.

Catrett*, 477 U.S. 317, 323 (1986). If the burden of persuasion at trial would be on

the non-moving party, then the moving party may satisfy its burden of production

by pointing to an absence of evidence supporting the non-moving party's case. *See

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986);

*Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989). If the

moving party satisfies its burden, the non-movant must "come forward with

specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S.

at 587 (internal quotation marks and emphasis omitted).

An assertion that a fact is, or is not, genuinely disputed must be supported

either by "citing to particular parts of materials in the record, including

depositions, documents, electronically stored information, affidavits or

declarations, stipulations (including those made for purposes of the motion only),

admissions, interrogatory answers, or other materials," or by "showing that the

8

materials cited do not establish the absence or presence of a genuine dispute, or

that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1)(A) & (B). The court will "draw all reasonable inferences

in favor of the nonmoving party, and it may not make credibility determinations or

weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133,

150 (2000). "[T]he facts asserted by the nonmoving party, if supported by

affidavits or other evidentiary material, must be regarded as true." *Aman v. Cort

Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996). If "there is any

evidence in the record from any source from which a reasonable inference in the

[nonmoving party's] favor may be drawn, the moving party simply cannot obtain a

summary judgment." *Id.* at 1081 (alteration in the original) (quoting *Celotex*, 477

U.S. at 330 n.2).

To defeat a motion for summary judgment, the nonmoving party must "do

more than simply show that there is some metaphysical doubt as to the material

facts." *Matsushita*, 475 U.S. at 586. "[T]he mere existence of some alleged

factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247–48 (1986) (emphasis omitted). A factual dispute is genuine only where "the

evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Id.* at 248. "If the evidence is merely colorable, or is not significantly

9

probative, summary judgment may be granted." *Id.* at 249–50 (internal citations omitted); *see also Celotex*, 477 U.S. at 322 (stating that entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). The "mere existence of a scintilla of evidence" in support of the nonmoving party's position is therefore insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252. Rather, there must be "evidence on which the jury could reasonably find" for the nonmoving party. *Id.*

## III.    DISCUSSION

### A.    Summary Judgment

Defendants move for summary judgment, arguing that "[t]here is no genuine issue of material fact that Defendants did not act with deliberate indifference concerning any alleged delay and/or denial of Plaintiff's medical treatment." D.I. 60 at 2.

In his Complaint, Plaintiff alleges that Defendants violated his Eighth Amendment rights. D.I. 3 at 3. At the time of his allegations, Plaintiff was a pretrial detainee. *See* D.I. 48 at 2 n.1. Eighth Amendment protections do not apply to pretrial detainees. *See Whitley v. Albers*, 475 U.S. 312, 318 (1986) (explaining how "the [Cruel and Unusual Punishments] Clause [of the Eighth

Amendment] applies only after the State has complied with the constitutional

guarantees traditionally associated with criminal prosecutions") (quoting *Ingraham*

*v. Wright*, 430 U.S. 651, 671 n.40 (1977)); *Hubbard v. Taylor*, 399 F.3d 150, 165–

66 (3d Cir. 2005). "Although the Eighth Amendment does not apply" to pretrial

detainees, "the substantive due process guarantees afforded [pretrial detainees] . . .

are at least as robust as Eighth Amendment protections afforded prisoners." *Hope*

*v. Warden York Cnty. Prison*, 972 F.3d 310, 325 (3d Cir. 2020). The Fourteenth

Amendment is thus the proper source of Plaintiff's constitutional rights.

Regardless of the source of Plaintiff's constitutional rights, the analysis is

practically identical. *See Parker v. Butler County*, 832 F. App'x 777, 780 n.1

(3d Cir. 2020).

        To establish a cognizable claim for inadequate medical care, an inmate must

allege (1) a serious medical need and (2) acts or omissions by prison officials that

indicate deliberate indifference to that need. *Estelle v. Gamble*, 429 U.S. 97, 104

(1976). Deliberate indifference requires "more than negligence." *Durmer v.*

*O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993). A prison official is deliberately

indifferent if he or she knows that a prisoner faces a substantial risk of serious

harm and disregards that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The

official must be both "aware of facts from which the inference could be drawn that

a substantial risk of serious harm exists, and . . . draw the inference." *Natale v.*

11

*Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (quoting *Farmer*, 511 U.S. at 837).

When medical treatment is provided, courts "presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care." *Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017). "A prisoner does not have the right to choose a specific form of medical treatment," so long as the treatment provided is reasonable. *Lasko v. Watts*, 373 F. App'x 196, 203 (3d Cir. 2010) (internal citation and quotation marks omitted). "[M]ere disagreement as to the proper medical treatment" does not give rise to a constitutional violation. *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987).

A prison official may manifest deliberate indifference by "intentionally denying or delaying access to medical care." *Estelle*, 429 U.S. at 104–05. "[A] delay or denial of medical treatment claim must be approached differently than an adequacy of care claim." *Pearson*, 850 F.3d at 537. In a delay or denial of medical treatment claim, "there is no presumption that the defendant acted properly." *Id.* The deliberate indifference prong of a delay or denial of medical treatment claim thus "involves only one subjective inquiry." *Id.* To survive summary judgment, the "surrounding circumstances" must "be sufficient to permit a reasonable jury to find that the delay or denial was motivated by non-medical

12

factors." *Id.* "The lack of an identifiable medical reason explaining a treatment delay does not necessarily mean that the delay was motivated by a non-medical reason." *Miller v. Steele-Smith*, 713 F. App'x 74, 80 (3d Cir. 2017).

Plaintiff seems to challenge Defendants' delay in providing Plaintiff with medical care for his left shoulder pain rather than the adequacy of the medical care provided. In the Complaint, Plaintiff describes several "sick calls" and visits with providers. *See* D.I. 3 at 4–6. Rather than challenging the treatment administered in those visits, Plaintiff challenges the delay in seeing providers for his left shoulder pain. *See* D.I. 3 at 6 (alleging that Plaintiff has been waiting for an orthopedic trauma surgeon that will accept the prison's medical insurance); D.I. 3 at 6 ("It's been 7 months [that] I have not seen [a] trauma doctor, and it's been 1 year I [have] been suffering this pain . . ."); D.I. 3 at 6 ("It shouldn't take this long for me to see a doctor.").

Plaintiff's decision to name as defendants two prison administrators—not medical providers—also suggests that the Complaint challenges the delay in medical treatment rather than the adequacy of medical care. *See* D.I. 3 at 2–3 (naming Christine Onofrio and Christine Claudio as defendants). Onofrio's role as a Consult Coordinator is "mostly administrative," D.I. 59-4 ¶ 4, consisting of, among other things, "schedul[ing] the consultations with outside medical specialists for incarcerated persons," D.I. 59-4 ¶ 3. In her "solely administrative"

13

role as the Health Services Administrator, Claudio "oversees the administrative medical operations," including "oversee[ing] the Consult Coordinator." D.I. 59-3 ¶¶ 2, 4. Aside from locating outside medical providers and scheduling consultations, Defendants were not involved in Plaintiff's medical treatment. Plaintiff does not identify any evidence that suggests otherwise. The Complaint, in fact, refers to Onofrio as "the lady that set up the appointment." D.I. 3 at 6. By directing his claim to prison administrative officials, Plaintiff challenges the timeliness but not the adequacy of the medical treatment he received.

Defendants do not dispute that Plaintiff's shoulder injury constituted a "serious medical need." Instead, Defendants' briefing focuses on whether there is a genuine dispute of material fact with respect to deliberate indifference. *See* D.I. 60 at 12 (arguing that "Defendants did not act with deliberate indifference to Plaintiff's medical needs") (some capitalization removed). To survive summary judgment, Plaintiff must identify record evidence showing that Defendants intentionally delayed Plaintiff's access to medical care for non-medical reasons.

The record evidence does not permit a reasonable jury to find that Defendants were deliberately indifferent to Plaintiff's shoulder injury. Rather, the record shows that Defendants accommodated Plaintiff's requests for outside medical consults and scheduled those consults in a timely manner.

14

Plaintiff first argues that his MRI was delayed because several medical providers refused to order an MRI, as he requested. *See* D.I. 3 at 5. As discussed above, Defendants are administrative officials, not medical providers. Prison medical providers are the individuals who can submit consultation requests. *See, e.g.,* D.I. 62 at 47, 58, 60, 63–65. Defendants schedule a consultation only after a medical provider has submitted a consultation request. *See* D.I. 59-4 ¶ 12; D.I. 59-3 ¶ 12. Because Defendants cannot, and do not, order medical diagnostic tests, any alleged delay in ordering an MRI can be attributed only to the medical providers. Defendants can only, therefore, be deliberately indifferent with respect to the *scheduling* of the MRI.

Shatyra Hamwright, a prison medical provider, ordered an MRI for Plaintiff on February 22, 2021. D.I. 62 at 47, 58. Hamwright marked the time frame for the requested appointment as "[n]ext available," not "emergent." D.I. 62 at 58; *see also* D.I. 59-3 ¶ 12; D.I. 59-4 ¶ 12. The record demonstrates that Defendants did not delay in executing Hamwright's request to schedule an MRI. Rather, Onofrio scheduled Plaintiff's MRI for March 23, 2021—a little over one month after the MRI consultation request. D.I. 62 at 17, 59; D.I. 59-4 ¶¶ 12, 14. There is no evidence that Defendants were aware that scheduling an MRI for March 23, 2021 would cause Plaintiff harm.

15

Plaintiff also argues that Defendants' delay in scheduling a consult with an orthopedic trauma surgeon constitutes deliberate indifference. *See* D.I. 3 at 6. Plaintiff claims that he had been waiting since March 2021 to see an orthopedic trauma surgeon and argues that "[i]t shouldn't take this long for me to see a doctor." D.I. 3 at 6. The record shows that the delay in scheduling an appointment with an orthopedic trauma surgeon was not intentional and, therefore, not deliberately indifferent.

Defendants arranged for Plaintiff to meet with an orthopedic surgeon from Bayhealth Orthopedics on April 23, 2021, one month after Plaintiff's MRI. D.I. 62 at 39–40, 57; D.I. 59-4 ¶ 17; D.I. 59-3 ¶ 17. The orthopedic surgeon recommended that Plaintiff be referred to an orthopedic trauma surgeon. D.I. 62 at 39, 57. Per this recommendation, on April 26, 2021, a prison medical provider requested that Plaintiff see an orthopedic trauma surgeon. D.I. 62 at 38–39; D.I. 59-3 ¶ 18; D.I. 59-4 ¶ 18. That same day, Onofrio began looking for an orthopedic trauma surgeon who would accept Plaintiff as a patient. D.I. 59-4 ¶ 18; D.I. 59-3 ¶ 18.

Plaintiff saw an orthopedic trauma surgeon on November 16, 2021. D.I. 62 at 9, 61. The record demonstrates that, in the six months between the consultation request and the day the appointment was scheduled, Defendants searched diligently for an orthopedic trauma surgeon. *See* D.I. 62 at 13–17, 19, 22–23; D.I. 59-4 ¶¶ 18–28. Onofrio "sent out state-wide requests to orthopaedic trauma surgeons[,]

16

. . . [but] no Delaware orthopaedic trauma surgeon would accept Plaintiff as a patient." D.I. 59-4 ¶ 19. Onofrio "followed up weekly with various practitioners, contacts, and open sources to try and locate this highly-specialized orthopaedic trauma surgeon who would be willing to accept Plaintiff as a patient." D.I. 59-4 ¶ 20. Onofrio also worked with individuals in Centurion's corporate offices to try to find an out-of-state practitioner who would accept Centurion insurance. D.I. 59-4 ¶ 22; D.I. 62 at 19. Claudio oversaw Onofrio, D.I. 59-3 ¶ 34, and she "supported and assisted [Onofrio] in any way that [she] could," D.I. 59-3 ¶ 35. Defendants and their colleagues "asked for, and received assistance from, multiple Centurion employees, such as[] employees who worked in the utilization management department and Centurion's network manager." D.I. 59-4 ¶ 27; D.I. 59-3 ¶ 28. On September 14, 2021, Onofrio contacted Bayhealth Orthopedics "to see if [it] [could] recommend an ortho[pedic] trauma surgeon." D.I. 62 at 15; *see also* D.I. 59-4 ¶ 27. During this period, Onofrio and several medical providers informed Plaintiff that his consult was pending while the prison tried to find an orthopedic trauma surgeon who would accept Plaintiff and Centurion's insurance. D.I. 3 at 6; D.I. 62 at 11, 17–19, 23; D.I. 59-4 ¶¶ 25–26; D.I. 59-3 ¶¶ 26–27.

Ultimately, on October 26, 2021—after Plaintiff filed his Complaint— Onofrio found an orthopedic trauma surgeon in Philadelphia who would accept Plaintiff as a patient. D.I. 62 at 12; D.I. 59-4 ¶ 29. Onofrio scheduled Plaintiff to

meet with the orthopedic trauma surgeon on November 16, 2021. D.I. 59-4 ¶ 29; D.I. 59-3 ¶ 30; D.I. 62 at 12. The record thus does not contain any evidence that Defendants intentionally delayed or denied Plaintiff an appointment with an orthopedic trauma surgeon.

Plaintiff's opposition and sur-reply to Defendants' motion for summary judgment do not cite any contrary record evidence. Plaintiff's opposition simply requests that I do not dismiss his case because the prison and its medical staff have not fixed his ongoing problem. *See* D.I. 63. In his sur-reply, Plaintiff states that when he left prison in 2022, he "follow[ed] up on [his] appointment for [his] left shoulder" by going to the emergency room. D.I. 67 at 1. An emergency room doctor referred him to someone else, and it took two months to see an orthopedic doctor. D.I. 67 at 1. By that time, however, Plaintiff was incarcerated again. D.I. 67 at 1. None of these facts pertain to Defendants' alleged delay of Plaintiff's medical treatment leading up to September 2021, when he filed his Complaint.

In his sur-reply, Plaintiff also argues that "[prison] medical staff was suppose[d] to find someone [else] to help me after they gave [me] my MRI" but that they failed "due to the [coronavirus]." D.I. 67 at 1. Plaintiff asserts that "after [the coronavirus], [the prison] fail[ed] to assist me and use[d] [coronavirus] as an excuse." D.I. 67 at 1. Plaintiff alleges that when he was reincarcerated, Defendants had a year to find a doctor before he was moved to another prison. *See*

18

D.I. 67 at 1. These allegations relate to Defendants' challenged conduct. But such factually unsupported allegations do not meet Plaintiff's burden at the summary judgment stage. *See Williams*, 891 F.2d at 460 (noting that a nonmovant "cannot simply reassert factually unsupported allegations contained in its pleadings").

* * * *

Having concluded that there is no record evidence showing that Defendants acted with deliberate indifference to Plaintiff's left shoulder pain, I will grant Defendants' motion for summary judgment.

### B.    Motion to Appoint Counsel

Plaintiff has also moved for appointment of counsel. D.I. 77. "Indigent civil litigants possess neither a constitutional nor a statutory right to appointed counsel." *Montgomery v. Pinchak*, 294 F.3d 492, 498 (3d Cir. 2002). But, under 28 U.S.C. § 1915(e)(1), district courts have "broad discretion to determine whether appointment of counsel in a civil case would be appropriate." *Id.* (internal quotation marks omitted); *see* 28 U.S.C. § 1915(e)(1) ("The court may request an attorney to represent any person unable to afford counsel."). In deciding whether to appoint counsel, district courts must first "assess whether the claimant's case has some arguable merit in fact and law." *Montgomery*, 294 F.3d at 499. If a claimant "overcomes this threshold hurdle," district courts consider several factors. *Id.* District courts consider (1) "[t]he plaintiff's ability to present his or her case";

19

(2) "the difficulty of the particular legal issues"; (3) "the degree to which factual investigation will be required and the ability of the indigent plaintiff to pursue such investigation"; (4) the plaintiff's capacity to retain counsel on his or her own behalf; (5) the extent to which "a case is likely to turn on credibility determinations"; and (6) whether "the case will require testimony from expert witnesses." *Tabron v. Grace*, 6 F.3d 147, 155–57 (3d Cir. 1993). The Third Circuit has cautioned that "courts should exercise care in appointing counsel because volunteer lawyer time is a precious commodity and should not be wasted on frivolous cases." *Parham v. Johnson*, 126 F.3d 454, 458 (3d Cir. 1997); *see also Tabron*, 6 F.3d at 157 (describing "the significant practical restraints on the district courts' ability to appoint counsel").

Here, for the reasons stated above, Plaintiff's claim lacks arguable merit in fact and law. Plaintiff claims that Defendants violated his constitutional rights by intentionally delaying his medical treatment for non-medical reasons. But the record does not contain any evidence that Defendants were deliberately indifferent to his medical condition and need for medical treatment. Rather, the record shows that Defendants scheduled Plaintiff's medical treatments in a timely fashion, especially "given the complexities afforded under the prison environment coupled with the COVID-19 pandemic." D.I. 59-3 ¶ 34; D.I. 59-4 ¶ 33. Defendants scheduled an MRI for Plaintiff about one month after a non-"emergent" MRI

20

request. D.I. 62 at 17, 58–59; *see also* D.I. 59-3 ¶ 12; D.I. 59-4 ¶¶ 12, 14.

Defendants also scheduled an appointment with an orthopedic surgeon only one

month after Plaintiff's MRI. D.I. 59-4 ¶ 17; D.I. 59-3 ¶ 17. Defendants then spent

six months trying to locate an orthopedic trauma surgeon who would accept

Centurion insurance before ultimately finding an out-of-state orthopedic trauma

surgeon. *See* D.I. 59-4 ¶¶ 18–29; D.I. 59-3 ¶¶ 18, 28, 30; D.I. 62 at 12–17, 19, 22–

23. And, as stated above, Plaintiff does not identify any evidence showing that

Defendants intentionally delayed his medical treatment for non-medical reasons.

The Third Circuit has held that, where a district court has properly entered

summary judgment in favor of the defendants, it is also proper to deny the

plaintiff's motion for counsel. *See, e.g.*, *Tolbert v. Sipple*, 2024 WL 4345298, at

*4 (3d Cir. Sept. 30, 2024) (holding that "[the plaintiff's] motion for the

appointment of counsel is denied given the District Court properly granted

summary judgment in favor of the [d]efendants"); *Rhines v. Bledsoe*, 388 F. App'x

225, 227–28 (3d Cir. 2010) (affirming the district court's decision to grant the

defendants' motion for summary judgment and holding that the district court did

not abuse its discretion in denying the plaintiff's motion for counsel because "[the

plaintiff's] claims lack merit for the reasons already discussed"). .

Even if Plaintiff's claim were to have arguable merit, the *Tabron* factors

weigh against appointing counsel. Plaintiff has demonstrated that he is able to

present his own case. Courts often consider "the plaintiff's education, literacy, prior work experience, and prior litigation experience" as well as "the plaintiff's ability to understand English" and "the restraints placed upon [the plaintiff] by confinement [in prison]." *Tabron*, 6 F.3d at 156. Plaintiff has been able to describe his allegations with sufficient specificity to survive a motion to dismiss, D.I. 48 at 2, as well as respond to Defendants' motion for summary judgment, D.I. 63. The briefs that Plaintiff has filed with the Court show that he is able to read and understand English. And Plaintiff has prior litigation experience—he is a *pro se* plaintiff in three cases currently pending before me. *See* Case Nos. 21-1300, 21-1310, and 25-630. The legal issues in this case are relatively uncomplicated. Further factual investigation will be unnecessary, especially considering that Defendants have already produced more than 2,600 pages of documents to Plaintiff. D.I. 55. Because Plaintiff alleges a delay of medical treatment—rather than inadequate medical treatment—expert testimony will not be required. *See Parham*, 126 F.3d at 460 (noting that many medical malpractice cases "require expert testimony" because such cases "involve[] complex facts and medical records that even most lawyers struggle to comprehend").

Furthermore, the cases in which the Third Circuit has held that a district court abused its discretion by denying the plaintiff's motion to appoint counsel involved far more egregious delays in medical treatment than in this case. In

*Montgomery*, the plaintiff alleged that the defendant prison medical providers had lost his medical records. 294 F.3d at 494–95. The plaintiff alleged that, due to the loss of his medical records, the defendants denied him a cardiac catheterization that had been previously scheduled. *Id.* at 495. The plaintiff also alleged that the defendants "refused to administer his prescribed antiviral and cardiac medications, or to provide necessary x-rays and laboratory blood work" for ten months. *Id.* In *Colston v. Correctional Medical Services*, 256 F. App'x 551 (3d Cir. 2007), the plaintiff underwent surgery on his pinky finger. *Id.* at 552. The plaintiff then "experienced several delays in receiving necessary treatments and otherwise received inadequate medical care for over one year, ultimately resulting in the amputation of his finger." *Id.* And in *Parham*, the plaintiff complained of a ringing noise in his left ear. 126 F.3d at 455. The defendant—a doctor— prescribed ear drops that were not to be used for longer than ten days. *Id.* The plaintiff's ear began to ooze blood, and his hearing became impaired. *Id.* at 456. Yet, over the next five or six visits, the defendant continued to prescribe the same ear drops and declined the plaintiff's requests to see a specialist. *Id.* Ultimately, the plaintiff suffered severe hearing loss in his left ear. *Id.* By contrast, here, Plaintiff received continuous and timely medical treatment. I will therefore deny Plaintiff's motion to appoint counsel.

23

## IV.   CONCLUSION

For the reasons stated above, I will grant Defendants' motion for summary

judgment and deny Plaintiff's motion to appoint counsel.

The Court will issue an Order consistent with this Memorandum Opinion.